IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CARL EDWARD WILLIS                                                                    PLAINTIFF

v.                                        CASE NO. 06-2069

FRANK ATKINSON, GUARD MOULDER,
GUARD JACOB FINK, GUARD RESTINE,
CPL. PAUL, CAPT. CONGER,  LT.
JACKSON, OFFICER REILLY, OFFICER DUTTON,
CRYSTAL REED, AND ANITA BASS                                              DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

The Plaintiff, Carl Edward Willis, (hereinafter "Plaintiff") filed this civil rights action pursuant to 42 U.S.C. § 1983.  He proceeds *pro se* and *in forma pauperis*.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3), the Honorable Robert T.  Dawson, United States District Judge for the Western District of Arkansas, referred this case to the undersigned for the purpose of making a report and recommendation.

An evidentiary hearing regarding issues triable to a jury was conducted on June 15, 2009.  Previous to the hearing the undersigned issued a Report and Recommendation (Doc.  66) regarding Defendants' Motion for Summary Judgment. (Doc.  59).  The Report and Recommendation, in its entirety, was adopted by the District Court. (Doc.  69).  Plaintiff's claims of excessive force, denial of medical attention after an altercation with fellow inmate Combs, failure to protect from inmate Combs, retaliation, and lack of due process at a disciplinary hearing survived summary judgment and were the claims addressed at the evidentiary hearing.

-1-

## 1. Background & Evidence Presented

At the evidentiary hearing, I heard the testimony of the following witnesses in the following order:  (1) Tim Reilly; (2) Michael Restine; (3) Anita Lewis (formerly Bass); (4) John Dutton; (5) Paul Gadeke; (6) Crystal Reed; (7) Tony Mulder; (8) Charlie Rye; (9) Arthur Dickerson; (10) Robert Catchot; (11) Samuel Willis; (12) Salih Willis; (13) Carl Willis; and (14) Gayla Jackson.  For purposes of discussion, I will summarize in the first person the testimony given at the evidentiary hearing.

### Tim Reilly

My name is Tim Reilly.  I was a deputy with the Sebastian County Sheriff's Department during the time in question.  I began working there in 2005.

I know the Plaintiff by name and sight.

On April 16, 2006, I was a pod deputy.  I worked pod control, intake, and various job duties on an "as needed" basis.  I don't know which pod I worked in on April 16, 2006.  I don't know if I worked control on that date, but I may have relieved control at some time.  I did not accompany guards to CC pod for the shakedown of the pod that occurred on that date.

I have no independent recollection of the events which are the basis of Plaintiff's Complaint.  I need the report I wrote (Defendants Exhibit 2) to refresh my memory.  My memory is not refreshed to give me an independent recollection of the events, so I must use my report as evidence.

My purpose of coming into CC pod on April 16, 2006 was that I heard yelling and screaming while I was in the hallway outside CC pod.  The person yelling was the Plaintiff, so I came into the pod.  When I entered the pod, the only person screaming was the Plaintiff.  He was standing in front of his cell by Dutton and yelling at Dutton.

I approached the Plaintiff, and asked him to be quiet.  It was a long time before Plaintiff quit screaming and yelling – after the incident in question where force was used.

I don't know if any other inmates were in the pod at the time.  I asked Plaintiff to be quiet and step away from Dutton.  I took Plaintiff by the arm to separate him, per procedure.  At this time Dutton was doing nothing.  I did not leave Plaintiff with Dutton because I heard the confrontation from the hallway and felt it was better to separate the two people who were in conflict.

Plaintiff went to the wall, as I instructed, on his own power for a few steps.  Plaintiff was still yelling, but since he had walked away from Dutton, I let him go.  Plaintiff was still yelling while at the wall and when he came off the wall, so I removed him from CC pod.

Plaintiff was still yelling and fighting with me when we left CC pod.  Plaintiff was yelling at me to let go of his arm, but I did not because he was not obeying orders.

I was taking Plaintiff to the segregation unit because the vestibule area outside of CC pod is not secure and Plaintiff was still yelling, screaming, resisting, and not obeying orders.

Officer Restine entered vestibule area while I had Plaintiff there.  Restine helped escort Plaintiff to CC segregation.

Plaintiff asked for his legal work off of the pod floor and jerked away from me and Restine.  At this time, we took Plaintiff to the floor.  I don't know if I took Plaintiff to his knee.  I told him to quit resisting, he did not stop resisting.  Plaintiff was attempting to get up, to break our hold on him.  Restine used a drive stun on Plaintiff.  Plaintiff was told he would be tased again if he did not comply and the taser was placed on his shoulder.  I do not recall the Plaintiff saying anything, including "I'm not resisting."

-3-

When I first heard the commotion from the hallway, I did not know what the inmate was upset about.  During the whole confrontation, I told Plaintiff to be quiet several times.

Less than fifteen minutes passed from the time I entered the pod until the time the drive stun was administered.

The move to the segregation pod was a temporary move.  If Plaintiff had complied with the orders given when he was standing at the wall, the confrontation would have been over.

There could have been five or more people in the cell, but I don't remember.  For a shakedown we clear the pod, and then bring in a few inmates at a time.  I don't know what cell Plaintiff was in and if any others had been brought in.  I also don't know if other officers were in the cell or pod at the time.

There are cameras in CC pod.  However, I do not know if these cameras are working or should have been.

### Michael Restine

From August 2004 until April 2006 I was an employee of the Sebastian County Detention Center.  I moved from a deputy to a corporal during this time.

During a shakedown, we go through cells check for medication, weapons, and other contraband.  My duty on April 16, 2006 was letting the inmates in, a few at a time, to be searched.  The inmates are strip searched after shakedown to make sure they are not hoarding any contraband.  Part of my duty at the door was to watch the inmates in the outside yard and make certain they were not attempting to dispose of anything.  I let the inmates back in by cell.  Generally, there are two to three inmates per cell.  At the time of the incident I had only let a few inmates in, there were several waiting to come into CC pod.

I was standing about 20 feet from CC pod.  Reilly was in the hallway in front of CC pod.  I saw him in the hallway, but I did not see him go in when the yelling began.  I was watching the inmates in the recreation yard, making certain they did not try to dispose of any items.

At the time the yelling began, Reilly was closer to the incident and I could not leave my duty station.  I did not become involved until Reilly and Plaintiff moved into the vestibule.  Plaintiff was irrate, upset, agitated, and Reilly was telling him to be quiet.  I helped escort Plaintiff to CC segregation from the vestibule.  Plaintiff was resisting and yelling.

When we were taking Plaintiff to segregation, he jerked away.  We were unsure what was happening and we took it as a threat and used handcuffs to secure.  Plaintiff was pulling his arms away, and attempting to roll to his side and try to get up.  Plaintiff was not compliant with the orders he was given.

At that point, I used pain compliance to keep the injuries to a minimum.  The taser is a deterrent to persuade inmates to comply.  Dutton is assisting at this time, there are three officers attempting to handcuff Plaintiff at the time the taser is used.  The taser was deployed, but Plaintiff continued to struggle until the taser was put to his shoulder and he was told to quit resisting or the taser would be used again.  Plaintiff was then handcuffed, he stood up and was removed from the area.

We were still conducting searches of the inmate area, so Plaintiff was removed.  I have found that if inmates see another inmate fight, it can cause increased agitation, fighting and become a bigger problem.

Once we used the taser, I told someone to get a camera, but there was no battery.

I warned of the use of the taser before it was used.  I did not punch Plaintiff or slam his head on the concrete.

Plaintiff still needed to be searched , so Plaintiff was taken to the intake shower to search his person.  While in the intake shower I noticed a cut on Plaintiff's head.  There was no blood.  When we arrived at the shower, I told Plaintiff to put his head on the floor, and get into position where we can safely remove the handcuffs.

Plaintiff was on his knees, was told not to get up until ordered to do so.  Reilly took off the handcuffs and Plaintiff comes up, as if he is not going to wait.  He was put back on ground, and this time the officers were able to remove the handcuffs and move back before Plaintiff stood up.

The cut was noticed while we were in the intake shower.  It looked fresh, but was not fee-flowing with blood.

I took Plaintiff to nurse's station to treat his cut.  The nurse was not on duty at the time.  If Plaintiff asked me to go to hospital, I don't remember.  I can't remember if he asked to see a doctor, nurse, or other health care provider.

I cleaned the wound, bandaged it, and put him into segregation.  I told the deputy on duty to not put anyone with Plaintiff or to let out with anyone else.

When we switch an inmates location, we switch all of the inmates information on their wristbands and identifying tags.  I don't remember taking his information, but if I did it was for the purpose of his relocation, not to keep him from using the phone.

Protective custody is the same as lockdown or segregation.  I did not put Plaintiff in CC pod protective custody cell because he had "stirred up" the pod too much.

I do not recall any glass in the intake shower area or placing Plaintiff's head into the glass. There was no glass in Plaintiff's wound when we treated it. I never noticed Plaintiff having any problems walking. I don't remember if I asked the nurse the next day to look at Plaintiff, but I know I felt the wound was taken care of.

Before the April 16, 2006 incident, I had another disciplinary incident with Plaintiff in November or December of 2004. I had to lock down Plaintiff for not giving back his razor after shaving time.

I wrote a truthful report that Plaintiff threw a razor with me and got aggressive. I know nothing about the results of any disciplinary hearing or what happened with my report. I do not know what actions were taken beyond the writing of my report.

The taser used on April 16, 2006 was a X26. It has two darts which can be thrown or the cartridge can come off and the gun be placed directly on the body. Placing directly on the body is called a drive stun. The drive stun is what was used on Plaintiff. The stun will immobilize for about five seconds. The darts are more effective. I am certified to use a taser, and I also carried pepper spray at the time.

I decided to use the taser because of the close proximity of the people to each other and the number of people. If I had used the pepper spray, also called OC spray, I likely would have inhibited myself and other staff and deputies as well as the Plaintiff.

I am not a nurse or paramedic. I would have only known of an injury if I saw it or was told of it. The scratch on Plaintiff's head could have occurred before I ever noticed it. Plaintiff did walk under his own power.

For protection of the Plaintiff, he was placed in BB pod.  The general population inmates will attack protective custody inmates because protective custody inmates tend to be snitches or sex crime inmates.

I do not know Justin Combs or anything regarding an incident with Combs.

**Anita Lewis (formerly Bass)**

I am a registered nurse who worked for the Sebastian County Jail beginning in June of 2006. I was not working there on April 16, 2006.  While I worked at the Sebastian County Jail, there was always an nurse on staff.

**John Dutton**

I was part of the shakedown in CC pod on April 16, 2006.

There were no other shakedowns on that date.

I remember cell 14, where the Plaintiff was housed.

CC pod has cells 10, 12, 14, 16, 18 on bottom and cell 14 housed Willis, as well as inmates Clark and Griffin.

We initiated the shakedown to look for contraband.  The timing was random.

We found seven pills between two Styrofoam cups in the search.  Everything in the cell is searched when we do a shakedown.

Plaintiff came into his cell and began yelling about his legal mail.  Plaintiff yelled at me specifically about reading the legal mail.  No other inmates were in the cell at the time.  Other inmates may have been in the day area of the CC pod.  At the beginning of the confrontation there were no other officers in cell, there were others in the pod.

-8-

I felt Plaintiff was hostile.  Reilly showed up and took him away to contain the situation and calm Plaintiff down.  I did not call any officers over, because there were officers thirty feet from me during the time of the confrontation.

I saw the part of the confrontation with Reilly, where Plaintiff was taken to the wall and continued to yell and was taken toward vestibule.  I eventually joined the officers in the vestibule. I heard the incident in the vestibule and I ran out and saw Willis, Restine, and Rielly on the floor. Restine and Reilly were trying to subdue Plaintiff.  I tried to get a hold of Plaintiff's arm, get Plaintiff handcuffed and Plaintiff was trying to get off the ground.

I did not go with Plaintiff and others into the intake shower area because I had to continue with the shakedown.  During a shakedown we go through legal mail, separate it, and look for contraband.  We were not reading legal mail.

I wrote an incident report, Defendants' Exhibit 6, thirty minutes after the incident.  I did not note any injuries.

At disciplinary actions, reports and witnesses are used to review the decision.  When an inmate signs an admission of guilt, the lock-down begins immediately.  The Plaintiff signed an admission.

The Defendant's Exhibit 9 on page two states "hoarding medication" and "x7" is indicated. Additionally, it states "failure to obey lawful request" and "x5."  A failure to obey a lawful request is when an inmate is given an order to lock-down or do something reasonable such as stop yelling and it was not done.  The "x5" likely indicates five times the infraction occurred.  This could be five separate times or five repeats of the same incident.

During the verbal confrontation with Dutton, Plaintiff was arguing his items could not be searched.  Plaintiff knew of the grievance policy, he had been advised about it, and was familiar with it.

I saw the taser administered to Plaintiff.  It was used in the "drive stun" position.  There were numerous warnings to "give arm or taser" or "don't resist or taser."  I was also certified to use a taser.  The stun appeared to be administered to the small of Plaintiff's back.

I again saw Plaintiff when I placed him in BB pod, when I delivered the disciplinary report.  I delivered this report at about noon on April 16.  I watched Willis sign the page.  He admitted guilt and waived the hearing.  It looks like at first he refused and wanted a hearing.  I had another deputy with me at the time I delivered the report, I can't remember who that was and I can't read the initials on the report.  When I saw Plaintiff at noon to deliver the report  there were no complaints about any injury.  The confrontation happened at about 10:30 a.m.

If an inmate refuses to admit guilt, then there is a hearing.  If the inmate admits guilt, then no hearing and the discipline imposed begins immediately.

When Plaintiff originally signed and denied guilt, he used my pen.  However, Plaintiff then changed his mind and decided he did not want a hearing.  He then used the witness deputy's pen to sign.  I can not remember who this other deputy was.

I did not notice any bandage on Plaintiff's head at this time, nor did I notice any injury.  Plaintiff did not tell me of any injury.  He did not ask to see a nurse or say he was not feeling well.

There was no other inmate in BB segregation/lockdown.

Plaintiff never said he was afraid of inmate Combs or anyone else.  Plaintiff was in protective custody at the time due to multiple sex crimes against a child.  He never complained to me of racial

-10-

threats.  He never complained to me of a noose being hung over his bed.  However, I began to work in the Sebastian County Detention Center in January of 2006.  I was not there in 2004 or 2005 when the alleged incidents with inmate Combs occurred.

### Paul Gadeke

I was employed by the Sebastian County Detention Center in April of 2006.  I was a corporal at the time.  At the time of the incident I was supervisor at the Sebastian County Detention Center.  I know the Plaintiff.  From August 2004 until February 2005, I was also employed there, as a Corporal or Sargent.

I can remember three areas the Plaintiff was housed in BC in 1999.  AA7 the PC cell, and HC1, the hospital cell.  AA is the upstairs pod, AA7 is protective custody – all the inmates there are separate.

In AA there are 4 open base cells, 12 man cells.  AA7 had room for ten.  I don't know who many were housed there from August 2004 until February 2005.  I don't know if it could have been as many as seventeen.  I was around the Defendant on both the day and night shifts.  I worked the night shift between August 2004 and February 2005.

Plaintiff stood out to me.  I have not spoken to him since the fall of 1999.  Plaintiff would approach me daily for Tylenol for his bad teeth.

I have no recollection of nooses hanging in cell or about Combs.

I have no recollection of a conversation regarding race.

I there had been a threat I would have relocated Plaintiff to a safe area and take other action.  I would have passed down the information to other shifts.  If an incident occurred, I would have generated a report.

-11-

I received no complaint regarding anti-racial behavior from Willis or the staff.

**Crystal Reed**

I was the Registered Nurse in the detention center until July 2006.  Medications came in verified by the Arkansas Department of Corrections on inmates transported to testify, such as Plaintiff would have been.

The deputies dispense the medications.

I came into the jail on April 17, the day after the incident.  On Mondays I have reports of weekend activities.  Defendants' Exhibit number eight is my medical report.  I made remarks because I had looked over Plaintiff on that day.  Plaintiff was not holding or guarding his body or person.  He had a scabbed area of the head, but I saw no emergent need.  I didn't think he needed to see the doctor.  I did not take his temperature.  I did not treat the wound.  I did not administer any medication.

Plaintiff was brought by the deputies.  There was no medical request.  There was a doctor t see inmates if the situation warranted that action.  The only report generated is Defendants' Exhibit 8.

I felt no other exam was necessary for the Plaintiff.  I don't remember any treatment sought after the Combs incident.

The medical records show medications were distributed on April 11, 12, and 13.  Ultram 500 mg, which is a mild pain medication was given.

A muscle relaxer was given on the 11, 12, and 13th of April, 2006.

Tylenol was given, also and Plaintiff was out of medication on the 15th of April, 2006.  It was refilled on the 19th.

-12-

A review of file shows no request for a doctor, even if asked for, he is not likely to get to go given my observation of him.  If he had needed stitches, for example, I would have taken him to doctor.

The records in 2004 and 2005 do not reflect any incident with Combs.

**Tony Mulder**

I was employed in the Sebastian County Detention Center from August 2004 until February 2005.  I know of the Plaintiff because of the case.

On December 14, 2004 there was a jail incident report involving Plaintiff.  I have no independent recollection.  It appears I was passing out medication to inmates, including Plaintiff.  Plaintiff was insisting food was to accompany his medication.  I could not provide this without a nurse authorizing it, so I put it in the nurse's box to make a decision.

I don't remember if Plaintiff asked for grievance form.

I don't remember Plaintiff making a grievance.  I don't know for how long Plaintiff went without his medication.

**Charlie Rye**

I was an inmate housed at the Sebastian County Detention Center from January 2004 until January 2005.  I was in CD, AA, and CC pods.

I remember Plaintiff being housed with me.   Justin Combs was in that pod, Dickerson was in that pod, and Catchot was in that pod.

There was a paper figure and noose over Dickerson's bed as a joke.  Plaintiff saw it and was offended.  Plaintiff and Dickerson were the only two African American's in the jail.

-13-

I saw Corporal Paul around this time, but I can't remember Plaintiff speaking to Paul about the incident.

After this incident, the figure was hung over Plaintiff's bed. Plaintiff's reaction was to take it a racist statement and spoke to Combs about it. I was not aware of anyone speaking to officers.

When Restine and Plaintiff had an altercation regarding razors in the shower, Restine said the time was up and Plaintiff asked for more time. Plaintiff was not belligerent.

Plaintiff dropped his razor on the floor and Restine asked Plaintiff to pick it up. Plaintiff was locked down, for a day or two at the most.

I never saw Plaintiff speak with an officer regarding the issue with the noose. In the pod, I was across from Dickerson and I was awake when the incident occurred. I remember there being heated words exchanged about the figure, but I don't remember any fight.

### Arthur Dickerson

I was an inmate in the Sebastian County Detention Center from November of 2004 until December of 2004. I was in AA pod with inmate Catchot. The guard at night during that time was Corporal Paul. A hanging noose was placed over the bed, and Willis noticed it and got upset. Plaintiff spoke to Paul about the incident.

I know Plaintiff was upset, but I can't remember what was said. After Plaintiff spoke with Paul, it showed up against over Willis' bed. Paul said it was just a joke but Plaintiff was upset and disturbed. The figure was a little man made of toilet paper with a noose, and he was holding a little sign. I don't know what the sign said if anything. I just laughed it off.

There was no confrontation or fight, no injuries. I was not offended by noose. I did not come back to the Sebastian County Detention Center.

-14-

When Plaintiff came to Cummins prison where I was housed, he told me that Combs had jumped him and they had been in an altercation. I would not have known this if he had not told me. I have no details or personal knowledge of this incident.

I did not take the noose as a racial threat. Plaintiff took the noose from me after it was hung over my bed. I did not see it appear on Plaintiff's bunk.

I did not see Plaintiff speak with Paul. I don't know if he did speak with Paul. Plaintiff did speak to the whole pod about the incident.

**Robert Catchot**

I was housed in AA pod of the Sebastian County Jail between August 2004 and January 2005. I know Rye, Dickerson, Combs, Hobbs, and Edgar where in the pod at the same time.

I remember the noose incident. I don't remember if it happened in the night or day. I do remember Plaintiff being very upset about it. Plaintiff spoke to an officer and wrote grievances. I remember Dickerson and Willis speaking to Paul. I also remember Plaintiff speaking to the pod about the noose.

No one was moved as a result of Plaintiff speaking to the pod or the officers.

There was a fight on the floor between Combs and Plaintiff. I woke up to them fighting in the floor. Combs used the word "nigger" and Plaintiff asked him to stop using that word.

When I awoke, Combs was trying to "body-slam" Plaintiff into the floor. Plaintiff held Combs down and said he did not want to fight. Plaintiff did not continue to fight. One punch may have been thrown, but it did not connect. There was a lot of name-calling and verbal fighting and some wrestling.

I was asleep when the fight happened, so I don't know who started it.  This was two to three days after the noose incident.

I saw Plaintiff writing, and I assume it was him writing grievances.  The paper he wrote on was sent out when an officer collected it.

Plaintiff and I were housed together in Malvern, Arkansas at the Ouachita Unit and we first spoke of the case then.  Plaintiff never asked me to lie and we never practiced testimony or answers.

Charlie Rye made the noose, he was "messing around" with Arthur Dickerson.

Plaintiff was upset and spoke to the whole pod.  He didn't know who made the noose.

I saw Plaintiff speak to Paul at the door, I don't know what was discussed, but they spoke on the same day as the noose incident.

I can not remember that Combs was injured in the fight with Plaintiff.  Plaintiff was not injured to the extent I can remember.  They both may have had some scrapes from the incident.

The day after, there was tension in the pod, but it was calm.  I did not speak with Plaintiff on the day after the incident.

Plaintiff spoke with the pod about the incident, and did not appear to be scared or in fear. He was more upset and offended.

### Samuel Willis

I am Plaintiff's brother.  When he was housed in Sebastian County, he made an urgent call to me in April of 2006.  In this call he stated he had been jumped on, not allowed medical attention, beat up by the guards, pushed into floor with glass on it, and not allowed to make calls.

I had our other brother, who lives in Fort Smith, go by the detention center and check on Plaintiff.

-16-

Plaintiff came to live with me when he was released.  There was an eye injury that was visible and he took medication and spoke of a shoulder injury.  I remember the shoulder injury affecting him.

Plaintiff came to live with me in January or February of 2005, before the trial and lockup in 2005.  It was in 2005 he told me the guards pushed his head to the floor.  When he was released I saw the injury to the eye.  I don't know if it was the first or second time he was released.

The incidents with the guards and the glass may have occurred after he lived with me.

I can't remember for certain that I saw an injury above his eye.

About ten years ago Plaintiff was involved in a car accident, and was badly hurt.

He spoke of an altercation with an inmate, but I don't know when this happened.  I know there was also an incident with nooses.  I don't remember if this was before or after he lived with me.

My brother, Oliver Willis went over to discuss the incident.  I never spoke with anyone at the Sebastian County Detention Center.

I did see an eye injury, a cut over the eye.  When he was at my house to live, I can't remember and eye injury.

**_Salih Willis_**

Plaintiff is my father.  I am seventeen years old.  When Plaitniff was released from Sebastian County, I was living in Tulsa with Samuel Willis.  My father came to live with us for a time.  I don't remember Plaintiff unable to play sports with me and my cousins.  In 2005 there was a cut on Plaintiff's eye and an altercation with an inmate and some guards.  The guards took Plaintiff to the showers and "jumped" him in 2005.

-17-

I can't recall dates, I learned of these incidents over the phone.  I remember the incident with the inmate was different than the one with the guard.

***Carl Willis***

I am the Plaintiff in this action.  I first came to the Sebastian County Detention Center in August of 2004.  I was housed there for ten to fifteen days before I bonded out.  I was rearrested and incarcerated December 2, 2004 until February 11 or 12, 2005.  During my second incarceration, from December 2004 until February 2005, two of the incidents forming the basis of my complaint occurred.

First, I was physically and verbally accosted by Restine.  For twelve weeks when razors were given out to shave, the inmates would place them on the floor to pass back to the guards.  On one occasion Hobbs, the other black male in the Sebastian County Detention Center, and I were the only ones left shaving.  Restine came in and the policy suddenly changed.

I heard someone at the shower curtain using profanity and saying "give me your razor."  I stated I was not finished.  I was told "I don't give a 'g-d'" and "give me your 'g-d' razor."  It wasn't until I stated I was not finished that I saw it was a guard yelling at me.  I dropped it on the floor and was told to pick it up by Restine and more cursing was used.

When I came before the disciplinary committee for a hearing they found Restine had lied in his statement about the incident and dismissed any actions against me.

Second, there was the incident with Justin Combs, another inmate.  I didn't know who made the noose.  It was not placed over my bed first.  But at the time the noose incident was happening racial slurs were being used around the pod.  I was upset by the incident, but I was not mad.  I told the pod inmates it was 2004, and this shouldn't be happening.  I pointed it out to Cpl.  Paul.

-18-

The Aryan Knights were influencing the Sebastian County Jail at the time. There were symbols on the walls and some of the inmates in protective custody who came form California jails. These inmates told everyone that in California the white inmates didn't have anything to do with the blacks.

When I told Paul, he said the noose incident was just fun. I wrote letters to the sheriff and to United States Magistrate Judge Jones. The second time the noose was hung, I spoke to several other guards.

Inmate Hobbs said he was listening at night to many of the inmates say racially charged things.

The altercation began when Combs kicked me, and said he was tired of me talking about him. He picked me up and threw me. He injured my arm, my head hit on a wall.

A good friend of Combs was an inmate transferred from California who was involved with the Aryan Knights and was using racially charged language.

I was concerned about asking for help because of the previous incident with Restine, the fact that Paul had done nothing despite my concerns, and the fact Combs was put in the pod. The guards were turning their backs to what was happening.

I put in sick call to see nurse after a few days. The nurse I saw is not here to testify. I believe her name was Crystal. I explained to this nurse what had happened. The nurse said I was fine, but I went to the doctor when I was released. I then went to live with my brother and I couldn't do sports and could only use it occasionally.

I could not get any relief from the Sebastian County Jail for my injury. All I was given is Tylenol.

When I transferred back to Sebastian County from Cummins I was mistreated by the guards. I wrote grievances. I wrote a letter to Conger and I spoke with Jackson. I expressed my discontentment and fears. I was refused food, I was not allowed my legal work, and I was kept from the phone and from having a phone card.

As for the second incident with Restine, I was told there was not going to be a shakedown, and then the officers did one.

I was standing silent, and Reilly puts on his gloves. He grabs me and takes me to the wall. I am still not speaking. Reilly is still holding my arm and I asked him to let go because he was hurting me. Reilly would not let go. I am still quiet and I am not yelling. I did tell Reilly I would write a report. He told me to make sure I got his name right. He continued to hold me tightly and drug me out of the pod.

I never got into CC segregation. The reports reflect I was in CC segregation, but I was in the CC vestibule.

Restine joined Reilly in the CC vestibule. My legal work was still on the floor of CC pod, so I was asking for it. Restine drug me over to the CC segregation door.

I was thrown down on the floor and beaten. I only yelled "I am not resisting." I was jabbed in the back with a set of keys, my head was slammed into the concrete floor. Then, the taser was applied with no warning.

The officers have said they were holding my arms and that I refused to give them my arms. I don't understand how both could be happening. I was not given any orders. Once other officers arrived then Reilly and Restine began giving me orders.

-20-

I was taken to the shower.  Restine tells me to get on my knees.  I do not understand why I had to be strip searched.  I saw glass on the floor, and was looking for someplace to rest my head when someone slams my head down and it bounced back up.  I was dazed and began to get sick.

When the handcuffs were taken off, I was bleeding all over my face.  The strip search was still continued.

Restine tells me to wash my head, but I didn't really wash it all off.

My clothes were back on, and I went to the nurse's station.  Peroxide was applied to my wound, and the glass was taken out of my head and put in the trash can.

I told the officers I did not feel well and asked to go to the hospital.  Restine noticed the cut on my head.

After this I had cuts and abrasions and pain in my shoulders.  I was treated by doctors at the Arkansas Department of Corrections.

When I was taken to lockdown after the incident with the guards, the officers said they would tell the BB pod officer I ran into a door.  They took my arm band and name tag so that I couldn't contact anyone.

When the disciplinary report from April 16, 2006 cam to me, I signed refused.  The hearing officer was Dougherty.  I had a hearing on April 19, 2006.  I refused to sign the disciplinary.  I was refused the right to have witnesses present.  And I was threatened with more time of incarceration at Sebastian County.  This is why I did sign the paper as "guilty" under duress.

When it was time for the hearing, the one officer said he did not have the proper report, he had a second report that was different that then one I had.  One officer said he could not conduct the hearing and took a copy of my report and left.  Daugherty remained and told me I would be guilty

anyway.  I could be on lockdown and not go back to the ADC for up to one year.  I was told I still

had a right of appeal.   I tried to appeal to Lt.  Jackson after I returned to the ADC, but I was told

there was no appeal because I pled guilty to the charges.

I knew the grievance procedure at Sebastian County, and I knew the medical request

procedure.  I wrote medical requests and turned them in after the combs incident.  I know I wrote two

grievances regarding the Combs incident and submitted sick calls (several) which were not

responded to.  Finally, early in the morning one day I was taken to the nurse's station.

Restine retaliated against me because of the razor incident because I proved he lied on his

report.

The glass I have to present at the hearing today I took from the intake shower stall before I

was taken back to the Arkansas Department of Corrections.  As I was changing uniforms to travel,

I noticed it was still there.  This was likely a week after the incident.  It was on the floor of the

shower stall.  I smuggled the glass back tot he ADC and have kept it with me.  I avoided its detection

during strip searches because I put the glass in my belt area in an extra hole.  It was not the glass in

my forehead, but other glass which was in the intake shower.

I asked for the names of witnesses who saw me recover the glass, but I was refused.

***Gayla Jackson***

I am the document and record custodian at the Sebastian County Detention Center.

I reviewed the file for Plaintiff's records and have reviewed all of the grievances and medical

requests he submitted.  There is no record of a grievance submitted regarding racial issues with

inmate Combs.  There are no issues related to Combs at all in the medical or other records.

I believe Kevin Dougherty was the hearing officer.  I would have been the officer who oversaw any appeal.  I don't remember talking to Dougherty.  The record reflected he had pled guilty, so no appeal could be made.  I looked over the paperwork, but that was the extent of my investigation.

There was no indication of racial tension or motivations.  There were no other complaints or complaints about nooses.  The shower stall was used for showers almost on a daily basis at and since the time Plaintiff was incarcerated.  There have been no complaints or reports of glass on the floor or cuts on inmate feet.

## 2.  Discussion

A pre-trial evidentiary hearing may be utilized to determine whether a pro se inmate's section 1983 claims warrant a jury trial, as long as the hearing is conducted in a manner consistent with the inmate's right to a jury trial. *See Hobbs v. Lockhart,* 46 F.3d 864, 868 (8th Cir. 1995); *Johnson v. Bi-State Justice Ctr.,* 12 F.3d 133, 135 (8th Cir. 1993). The standard to be applied in such a proceeding is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Johnson,* 12 F.3d at 136 (citation omitted). "Even if both sides present evidence, so that the procedure resembles a summary judgment motion with live evidence, the standard remains the same." *Hobbs*, 46 F.3d at 868. In applying this standard, the court must avoid credibility determinations, believe the inmate's evidence, and draw all inferences in the inmate's favor. *Johnson*, 12 F.3d at 136.

Plaintiff claims excessive force was used on him by Defendants Dutton, Reilly, and Restine on April 16, 2006.  Plaintiff also claims he was denied medical treatment after a fight with fellow

inmate Justin Combs, and on April 16, 2006 after the altercation with Defendants Dutton Reilly and Restine.  Plaintiff claims Defendants failed to protect him from inmate Justin Combs.  Further, Plaintiff claims he was denied due process at his disciplinary hearing related to the April 16, 2006 incident with Defendants Dutton, Reilly, and Restine.  Finally, Plaintiff claims retaliation by Defendant Restine.

### Excessive Force

Plaintiff claims excessive force was used on him on April 16, 2006.  During a shakedown of the pod where Plaintiff was housed, Plaintiff became upset regarding the treatment of his legal papers.  Plaintiff was removed from CC pod and was eventually tased during this altercation.  The question before the Court is if the use of force was warranted in this instance.

The Eighth Amendment protects inmates from the unnecessary and wanton infliction of pain by correctional officers, regardless of whether an inmate suffers serious injury as a result.  *Hudson v. McMillian,* 503 U.S. 1, 9 (1992).  However, " Section 1983 is intended to remedy egregious conduct, and not every assault or battery which violates state law will create liability under it." *Askew v. Millard,* 191 F.3d 953, 958 (8th Cir.1999) (citing *Harberthur v. City of Raymore,* 119 F.3d 720, 723 (8th Cir.1997)).  Officers do not violate the Eighth Amendment when they use force reasonably "in a good-faith effort to maintain or restore discipline." *Hudson,* 503 U.S. at 9. In excessive force cases, it must be "determined whether the force was applied 'in a good faith effort to maintain or restore discipline, or maliciously or sadistically to cause harm.' " *Estate of Davis v. Delo,* 115 F.3d 1388, 1394 (8th Cir.1997) (quoting *Hudson,* 503 U.S. at 6). Factors for consideration in deciding whether a particular use of force was reasonable are whether there was an objective need for force, the relationship between any such need and the amount of force used, the threat reasonably

-24-

perceived by the correctional officers, any efforts by the officers to temper the severity of their forceful response, and the extent of the inmate's injury. *Hudson,* 503 U.S. at 7.

At hearing, it was clearly established that Plaintiff was upset regarding the surprise shakedown, the treatment of his legal mail, and the fact that contraband was found and attributed to him. He was removed from CC pod in an attempt to calm him down. The evidence is clear an attempt was made to restore order.

Plaintiff testified he was yelling at the guards at different stages of this altercation. At times he states he was yelling that he was not resisting, but the evidence shows he was not complaint with orders or lawful commands. I find that some amount of force was necessary to control the situation. Clearly, Plaintiff needed to be controlled and removed from the CC pod area. Additionally, I find that measured force was used to control the situation.

Plaintiff was removed from CC pod, and then handcuffing or restraining was attempted, and finally a taser was applied as is consistent with a graduated use of force. There is no evidence to indicate the use of the taser or other use of force was excessive in this instance. The taser appears to be applied after other force techniques proved ineffective.

Defendants Dutton, Reilly, and Restine were consistent in recounting the events in question. While there may have been words and tempers flaring between Plaintiff and Dutton, it was a third-party Reilly who led Plaintiff out of the CC pod area and attempted to cool down the situation.

Moreover, there exists no evidence of a serious injury. Plaintiff shows a cut on his head as also reflected in the photographic evidence. (*See* Defendants Exhibit 7). However, there are no contemporaneous medical requests. Plaintiff did see the nurse the next day April 17, 2006. (*See* Defendants' Exhibit 8). The nurse stated Plaintiff had no emergent medical need. At the time,

-25-

Plaintiff only complained of groin pain resulting from the use of the taser. A small cut was noted as scabbed over. This medical evidence is consistent with a graduated and specifically applied use of force.

It is my report and recommendation there is insufficient evidence to establish that the use of force in excess of that reasonably believed to be necessary in the interests of safety, security, or efficiency.

### Denial of Medical Care

Plaintiff claims he was denied medical care on two occasions. One, after a physical altercation with fellow inmate Justin Combs. Two, after he was tased and force was used on him by Defendants Reilly, Dutton, and Restine on April 16, 2006.

"Deliberate indifference to a prisoner's serious medical needs violates the prisoner's Eighth Amendment right to be free from cruel and unusual punishment." *Warren v. Fanning,* 950 F.2d 1370, 1373 (8th Cir. 1991) (citing *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976)). To establish such a claim, a prisoner must "demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997) (alteration added). "A medical need is serious if it is 'obvious to the layperson or supported by medical evidence, like a physician's diagnosis.' " *Moore v. Jackson,* 123 F.3d 1082, 1086 (8th Cir. 1997) (quoting *Aswegan v. Henry,* 49 F.3d 461, 464 (8th Cir. 1995)). A prison official is culpable for deliberate indifference to that serious medical need if the official is "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists" and actually draws that inference. *Bender v. Regier,* 385 F.3d 1133, 1137 (8th Cir. 2004); *see also Cook v. Pueppke,* 421 F. Supp.2d 1201, 1205 (E.D. Mo. 2006).

-26-

It is undisputed that Plaintiff received medical care after the two instances in question. Plaintiff states after submitting medical requests he saw the nurse early one morning after the incident with Justin Combs.  Also, Plaintiff states he saw the nurse the day after a taser was used to subdue him.  Plaintiff's complaint is not that he did not receive medical care, as he clearly admits he did, but that the treatment was inadequate for his injuries.

After Plaintiff's fight with Combs there is no evidence he sought treatment.  Robert Catchot saw the fight and could see no visible injury.  Two family members testified regarding Plaintiff's shoulder injury, however this was not an injury they could see or evaluate for themselves.  Rather, the family members were merely recounting what was told to them by Plaintiff.

Regarding the incident on April 16, 2006, the nurse and the guards found no stitches were necessary.  Plaintiff was seen by the nurse the next day, and the nurse determined there was no need to see a doctor or to visit the emergency room.  Plaintiff exhibited no difficulty moving, he was not guarding any area of his body, he did not vomit from the alleged head trauma, or complain of a headache.  Hours after the incident Plaintiff was visited by Defendant Dutton when Dutton served Plaintiff with the disciplinary action.  Plaintiff was coherent and oriented at this time.

The evidence clearly shows treatment was given to Plaintiff.  Any disagreement with treatment decisions is not actionable under Section 1983.  Furthermore, there is no evidence Plaintiff suffered an increased injury due to any delay in the medical treatment.  I find there is not sufficient evidence for this claim to proceed to trial.

Additionally, it was noted at the hearing Anita Lewis (formerly Bass) was not employed at the Sebastian County Detention Center at the time of the events in question.  It is my recommendation she be dismissed from the case.

-27-

### *Failure to protect*

Plaintiff alleges Defendants failed to protect him from fellow inmate Justin Combs.  Plaintiff states he spoke to Cpl.  Paul Gadeke about his concerns for his safety after a figure and noose was hung over his bed and the bed of another inmate.  Plaintiff states he was injured by inmate Combs.

"[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." *Cortes-Quinones v. Jimenez-Nettleship,* 842 F.2d 556, 558 (1st Cir.  1988) (internal quotation marks and citation omitted), *cert. denied*, 488 U.S. 823 (1988); *see also Wilson v. Seiter,* 501 U.S. 294, 303 (1991) (describing "the protection [an inmate] is afforded against other inmates" as a "conditio[n] of confinement" subject to the strictures of the Eighth Amendment); *see also Farmer v. Brennan,* 511 U.S. 825, 833(1994).

Not every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety.  The United States Supreme Court has held that a prison official violates the Eighth Amendment only when two requirements are met.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  First, the deprivation alleged must be, objectively, "sufficiently serious;" a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities."  *Id.*  For a claim based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.

The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Wilson,* 501 U.S. at 297(internal quotation marks, emphasis, and citations omitted).  To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind." *Id.* at 302-303.  In prison-conditions

-28-

cases that state of mind is one of "deliberate indifference" to inmate health or safety. *Farmer*, 511 U.S. at 837. A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

It is unclear from the evidence presented whether the Defendants were notified of the issue regarding the noose. The testimony of Cpl. Paul was that he had not spoken to the Plaintiff since 1999 and that no threat or other issue was conveyed to him regarding a noose or racial incidents. However, Plaintiff and Plaintiff's witnesses recalled Plaintiff speaking with Paul at or near the time of the incident, although none of the witnesses knew what was said between Paul and Plaintiff.

However, there is no evidence of a substantial risk of harm to Plaintiff from Justin Combs. Arthur Dickerson testified he believed the noose incident to be a joke, not a threat. Indeed, Plaintiff's own testimony reflected a reaction of outrage more than one of fear. Plaintiff stated he talked to the whole pod about the incident, and condemned it as inappropriate. Clearly Plaintiff was offended, and rightly so. Yet, the legal requirement is that a risk of harm exists from which the Defendants are deliberately indifferent. Even if the Defendants knew of the incident, there is no evidence they knew of any harm that would befall Plaintiff. Plaintiff himself was more than willing to confront the issue, rather than fear the situation.

I find there is no evidence of a significant risk of substantial harm to Plaintiff. Defendants, whether told or not of the racial language and the noose figures, did not disregard an excessive risk to safety.

-29-

***Lack of Due Process***

Plaintiff alleges he was denied due process when he was forced to plead guilty to disciplinary charges under coercion and forgo a hearing or appeal resulting from the April 16, 2006 incident with Defendants Dutton, Reilly, and Restine.

The Supreme Court in *Wolff v. McDonnell, 418 U.S. 539, 563-67 (1974)* held that when a protected liberty interest exists in connection with a prison disciplinary proceeding, due process requires that an inmate must receive: (1) written notice of the disciplinary charges at least 24 hours before the disciplinary hearing; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement from an impartial decision maker identifying the evidence relied on and the reasons for the disciplinary action. *See Wolff ,* 418 U.S. at 563-67.

The disciplinary report shows Plaintiff signed that he received notice of the disciplinary report at noon on April 16, 2006, just a few hours after the incident.  The report is unclear if Plaintiff waived his right to hearing and admitted guilt or if he refused.  The bottom of the document notes "refused" and has initials of "KMD" noted in the area for admitting guilt and waiving a right to hearing.  However, the "refused" is marked out and Plaintiff's signature appears beside it. The Plaintiff did admit, for the first time at the hearing, that his signature did appear at the bottom of Plaintiff's Exhibit 2 which admits the charge and waives his right to a hearing.

The signature of Plaintiff on the Inmate Disciplinary Report (Plaintiff's Exhibit 2) at the bottom of the exhibit appears in a different pen than the signature of Plaintiff acknowledging the receipt of the report.  Dutton gave credible testimony that at the time he delivered the report to Plaintiff, Plaintiff initially refused to sign, but then changed his mind and admitted guilt.  Plaintiff

-30-

used a pen supplied by an unknown officer who accompanied Dutton to deliver the notice when he signed the second time.

Despite this testimony, it is clear Plaintiff was given a hearing for some reason.  Defendants exhibit 9, titled Report of disciplinary findings is dated April 19, 2006 in question (Defendants Exhibit 9) shows that Daugherty was the hearing officer.  The report also reflects Plaintiff was advised of his rights at the hearing, however the report is not signed by Plaintiff.

Plaintiff admits for the first time at the hearing that Plaintiff's Exhibt 2 where he admitted guilt and waived a hearing but now asserted that he signed the form under duress.  He now claims that the inmate disciplinary report cites him for seven infractions of hoarding medication and that it carried a 70 day lockdown per violation.  He was also cited for five violations of failure to obey lawful request which he contends carried a 25 day lockdown per violation and he was cited for a verbal confrontation with a deputy which carried 30 days lockdown.  The Plaintiff now contends that it was deputy Dougherty who threatened him with more than one year of lockdown and not being transported back to the ADC.  The Plaintiff had never made an allegation that he had been threatened with over a year in lockdown to get him to admit his guilt.

Sometime prior to April 26, 2006 the Plaintiff did send a letter to Lt. Jackson stating that he wanted to appeal his disciplinary action.  The Plaintiff had been returned to the Arkansas Department of Correction by this time and Lt. Jackson responded that no appeal would be granted because he had admitted his guilt. (Defendant's Exhibit 10)

The evidence clearly shows the claim of denial of due process lies against Dougherty; however Dougherty has not been named as a Defendant in this suit.  As such, there is no evidence supporting Plaintiff's claim he was denied due process by any of the named Defendants.

*Retaliation*

Plaintiff has claimed he was the subject of retaliation by Defendant Restine.  Plaintiff alleges that during his incarceration in 2004-05, Restine wrote a disciplinary report on him, which went to a disciplinary hearing where Restine was found to have lied in the report and the disciplinary action was then dropped against the Plaintiff.  Plaintiff attempts to connect that previous encounter with the April 16, 2006 incident where he alleges excessive force was used.  Plaintiff contends the force was retaliatory.

Restine testified he did not know anything regarding the outcome of the previous disciplinary hearing in 2004-05.  This testimony appears to be credible.  Moreover, there is no evidence showing Restine knew about the outcome of the previous disciplinary hearing, or even evidence to substantiate the outcome of the hearing was as Plaintiff claim.  Similarly, there is no evidence to connect the April 16, 2006 incident with the 2004-05 incident.  The length in time is significant.  Also significant is that according to Plaintiff, it was Dutton and Reilly who initially interacted with Plaintiff on April 16, 2006.  Officer Restine did not assist until Plaintiff was in the CC pod vestibule.

There is no evidence connecting the two events with Restine to provide any basis for a claim of retaliation.  Moreover, there is no evidence of any protected activity by Plaintiff for which Restine would be retaliating. "Conduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason." *Cody v. Weber,* 256 F.3d 764, 770-71 (8th Cir. 2001).

### 3. Conclusion

For the reasons stated above, it is my recommendation the evidence is insufficient to support a finding on Plaintiff's claims in this case. I recommend the Plaintiff's Complaint be dismissed on these issues.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED this 1st day of July 2009.**

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE